All right, our second case is 23-4612, United States v. Booker. Mr. Allman. I'm William Allman from Asheville, North Carolina, member of the CJA panel, and I represent Mr. Booker on this appeal. Would like to reserve five minutes of my time for rebuttal. Mr. Booker represented himself at trial. He then did have appointed counsel for the sentencing hearing. And essentially, there are three different sets of charges within his ten-count indictment. Conspiracy to defraud the United States, being count one health care fraud, violating anti-kickback statutes, money laundering conspiracy, and eight of that, the same. He received a total of 200 months. It's my understanding he's since had a stroke. I was asked to bring that to the court's attention. But in a nutshell, the government contends that he was the mastermind behind a scheme wherein Medicaid-eligible individuals were recruited and required to submit urine samples, absent medical necessity at times, in some situations, in order to participate in subsidized housing programs and other programs under the auspices of his company, which was the United Health Care Service. Yes, sir. To begin, was the motion for judgment of acquittal done by the defendant pro se, or was that counsel? I believe the motion for acquittal was alluded to by the court and then made by the defendant at time of trial. He was not – his appointed counsel was not active in the case until the sentencing hearing. All right. Because looking at that, I'm not sure that there was a challenge in the district court to the sufficiency of the evidence for the anti-kickback statute. And Your Honor may well be correct on that.  I will tell the court that Mr. Booker did testify. He maintained that he was focused on community outreach. His role was different, helping marginalized individuals. He had nothing to do with the administrative responsibilities of his organization, which he had primarily delegated to Mr. Graves, who later pled guilty and was a principal witness against him. And he also had his own lab and he had his own Medicaid billing service. And we do recognize questions of fact and credibility are generally for the jury. But we do contend that there are several issues that do give this court cause to revisit what happened at trial. With respect to the conspiracy charge as well as the kickback, substantial evidence, again, taken in the light most favorable to the government, does require proof of knowing and intentional conduct. There was no evidence that showed Mr. Booker directly ordered any urine tests, that he procured any standing orders for medical necessity, nor did he submit any bills to Medicaid. All the billing protocol was done. It was delegated to and administered by Mr. Richard Graves. Do you think that that's a necessary component of the elements of the offense? I mean, I thought the testimony was that even if he wasn't directly involved, he certainly knew what was going on and approved it and agreed with it. I'm sorry, Your Honor, I missed the last part of the question. That even if he didn't directly do those things that you have alleged, that he was certainly aware of what was happening, that his subordinates were actively engaged in this activity and that he was he approved of it. If there was substantial evidence of his knowing, intentional participation and conduct. Wasn't that the testimony at trial? Well, again, that is a matter that is more properly evaluated, I would say, by the jury. And the jury did make the decisions that they made. But we contend that some of the evidence that they heard should not have been heard and could may well have resulted in a different verdict if certain things had not been introduced into evidence, which is part of my argument. I'll jump ahead with the court's approval. But I thought part of your argument is that even notwithstanding those issues, that the evidence just wasn't sufficient. Yes, sir. We would we would contend that based on the fact that Mr. Booker's role was quite isolated and insulated from that, which was the criminal conduct that. Yes, we would contend that there is a substantial evidence argument, which is what we made based on the fact that most of the criminal activity which he was prosecuted for was was done by others. And just so I'm clear about that, your characterization of that role is based. Exclusively, if not entirely on your client's testimony, right? Not entirely, but somewhat. Yes, sir. At the same time, the people who were testifying against him, everyone had taken a deal and had reason to to say what that is shocking, not shocking at all. Sir, I agree with that. But again, I would say that Mr. Graves is the one who the evidence showed negotiated the contracts. Miss Miss Jordan with Legacy Housing had a modified contract that he submitted to the lawyer for approval. McMillan, he is the one who kept track of the referrals. He negotiated the contracts and the supplemental joint appendix, which was which the court, I'm sure, has reviewed shows that Mr. Booker's signature was on many of the checks. But Mr. Graves had created a signature stamp and we don't know who actually signed the checks that were in the supplemental joint appendix. It's unclear what information Mr. Booker had at the time he was signing checks. If, in fact, he was signing the checks, he didn't pay much attention. Ignorance of the law may be no excuse, but it does impact intent. And knowing an intentional conduct is important when you're talking about substantial evidence. Mr. Peer and Miss Stringfellow of Everlasting Vitality later do it. So they made about 12 billion dollars. If I'm remembering this record correctly, he was just a fortunate beneficiary of. Of of that largess. Was he a beneficiary? Is that your honor's question? Right. But I mean, it just so he was clearly a beneficiary. I acknowledge that he owned the company. There was a lot of money going in and out. No question. Would the jury be entitled to ask whether he just came by and picked up the checks like he won the lottery or. Well, that might not be believable. It was a large organization. United Youth Care Services did a lot of things in the community. They had a lot of programs. They had a lot of employees. So in terms of what was operational, which is also part of my argument versus what was fraudulent kickback. It's not it's not totally clear in this case. But wouldn't it be up to the jury? And in this case, he had a trial to determine the criminal intent. Well, I have done 30 years of trial work and I do understand that concept, Your Honor. But again, I we're challenging the the the idea of knowing an intentional conduct, which is a requirement and an element. And with respect to the jury, I would like to jump ahead to to an argument that I really think is what tainted the evidence in this case. And that is the exhibit to 63 of the Sandhills audit. Sandhills oversaw the Department of Health and Human Services operations for United Youth Care Services in particular. And if you look in the supplemental joint appendix, you'll see much of it was redacted. But Section 19 concludes that Mr. Booker subjected clients to exploitation. And that's a key word. That's a loaded word. That's a big word. And we would submit that that was highly prejudicial. So it could well have impacted his credibility and impacted what the jury might otherwise have thought. But that wasn't submitted in the government's case in chief. Right. It was submitted in rebuttal. Actually, Your Honor, the exhibit came in the case in chief, I believe, if I'm recalling correctly. It did. And there was a continuing line of objection to that at that time. But you are correct in that the government did double down on that at the time of rebuttal because they offered testimony from the manager, the program manager, program director, actually, of Sandhills. And he further testified that he found evidence of credible fraud, which, of course, led to the prosecution to begin with. So what we had in this case was we had the results of a civil administrative hearing being utilized in a criminal case. We have a different burden of proof. We had a limited opportunity to cross examine. Or Mr. Booker did. Obviously, he was representing himself. Anyone who was involved in that civil hearing other than potentially this one program director. So which is why I cited the confrontation prior to that. Mr. Booker had asked a witness several times. We were audited by Sandhills and they never said anything adverse to us. And that would seem to be opening the door for a rebuttal. Well, yes, Your Honor, that was the government's contention to in their brief. And he did ask on cross examination of Richard Graves, were we not audited frequently? And they were. They were audited quite often. And apparently the evidence indicated that they did workshops on fraud and abuse in response to those audits. But then he asked, I believe this was the key, was were we ever told we were doing kickbacks? And that's on the joint appendix to 785, 786. And Graves said no. But I would argue that's a little bit of a stretch to be able to put into this type into evidence, this type of prejudicial evidence, the exhibit as well as the rebuttal evidence. I think that that, you know, that that definitely skews things in a way that was unnecessary to, you know, have them skewed, so to speak. Was there an objection? Was there an objection? Was there an objection? There was an objection, yes, sir, to exhibit 263 at the time. Yes, sir. And that also brings into play the rebuttal evidence with respect to Mr. Booker's bank account. He apparently had a line of credit with uniform with United Youth Care Services and a one million dollar debit for that account went into his personal account. And he testified as to that. He was asked about it and he indicated that he had a line of credit. He was able to maneuver funds back and forth, which which speaks to the offense of embezzlement, which he was not charged with. And no bank representative was called to testify with respect to any of that either. And I believe the argument in the government's brief was that that shows his intent or his motive to commit fraud or abuse. And that is also prejudicial evidence under 403 we would submit because it really doesn't show any connection to the charges at hand, other than the fact that there was an account in his name that he had access to that also he shared with United Youth Care Services. There was no connection to any of the checks that he wrote out of that account either. So no evidence was offered. Again, no opportunity to cross examine anyone with respect to that. So that again, that that is essentially the argument with respect to the evidentiary concern of the jury function. I think that the jury function certainly is what it is. I can't argue with the way it's been established for years. But when the jury is hearing things that they arguably should not have heard, then that does impact the validity or the take of the trial itself. I want to I want to ask you about why you still have some time about your merger portion of the appeal. I'm curious as to what your response is to the government. The government sites Halstead and says that these two are the reason that they are there's a merger because they're there's not emerges because one. That these are two separate actions. Yes, your honor. Your kickbacks anti kickbacks with respect to money laundering. Our argument was that it could arguably be double jeopardy to have him convicted of both the underlying acts as well as the checks themselves. And as far as Halstead goes, that's cited by the government. That was, of course, a health care fraud claim case. But the amounts were broken down clearly in that case. The case I cited, Santos, which was a legal gambling case, money laundering requires a limitation to the net profits of the operation, not including any type of operational expense or. After Santos, Congress amended the statute so that it specifically includes gross receipts. And that was done several years before the conduct that's alleged in the indictment. So. Is there anything left of a Santos argument now? Well, again, I would say that when you are dealing with the situation, your honor, that you've got some legitimate activity that is being conducted by an organization that's trying to help the community. And then you have certainly some fraudulent activity going on, too. It should be clear as to what is what. That's I think that was also the result in the Halstead matter. Believe one point three million was determined to be fraudulent of the five point eight million in that case. And in this case, there was no breakdown. So we all we only have aggregate figures. So a merger of the merger argument being that we can't separate the fraudulent conduct from the other conduct. So that's our response as best I can to that. And you separate it by the type of activity that is the subject of the money laundering. So I know there are cases that suggest that when you're dealing with so-called concealment money laundering, that that is different from promotional money, money laundering. The latter perhaps being subject to merger the former not. And doesn't the evidence in this case suggest that we're dealing with concealment? Well, again, we're back to questions of fact and the concealment has to be shown to be intentional with knowledge. And when you're writing checks, it's pretty easy to for checks to be discovered. So I don't know that the act of writing checks in and of itself. What about the act of the the act of how the checks are written? The five thousand versus the ten thousand. So you don't have to do reporting. Well, it could well impact who's responsible for what. Again, they did have a signature stamp and there's very little evidence as to who wrote what and what was known at the time checks were signed and other than who did it. And we weren't specific with respect to that either, which also goes to my argument with respect to loss amount. If I may, the the loss amount determination had no breakdown either. And this was raised by the attorney at the time of sentencing that was appointed. I believe the kickback figure was roughly one point five to three point five million. And that figure is substantially less than the nine point five million threshold for a base offense level of 20. I did cite and I realize it's not binding on this court. out of the Third Circuit, which held that loss should be based on the amount attributable to fraud alone. So, again, and as far as sentencing, if I may, I realize my time is running low over time right now. I'm sorry. You're actually over your time. I'm over my time. I apologize. I will simply say 200 months versus 30 months from Richard for Richard Graves is a significant disparity. We would submit that the sentence was substantially unreasonable. Thank you very much. Thank you. You've got some time left for rebuttal. Thank you. Mr. Ray. May it please the court. Amy Ray for the United States. Your Honor, this court should affirm the judgment of the district court because Mr. Booker received a fair trial and his sentence is both procedurally and substantively reasonable. To respond to your honor's question just about the motion for judgment of acquittal. That was something that Judge Bell did himself. He just jumped in and said, I'm going to assume that you filed that you were going to sort of treat this as a motion for judgment of acquittal. That's on page 949 of the joint appendix. If your honor wants to refer to that, Judge Agee. Your honor's there with the government. The jury heard ample evidence of every element of each of these offenses. With respect to Mr. Booker's intent in particular, Mr. Graves testified about how they learned that kickbacks were illegal. And about 2016 or so, they got education. They learned about the anti kickback statute. Mr. Pair, Mr. Springfellow, Miss Jordan, all testified that the illegality of the kickbacks was well known. In fact, that is why Mr. Booker had them structure employment agreements after the fact to try to justify those kickbacks. In other words, instead of having a per cup kickback, he crafted false employment contracts with each of these co-conspirators. And maybe one of the best pieces of evidence about that is the fact that both Mr. Springfellow and Mr. Graves testified about how it with the do it for the hood program. Mr. Springfellow would after he got the kickbacks, he would create an invoice that justified that kickback, even though it was months or weeks or months later. Proof that that was something that they structured. Dolores Jordan testified about how her payments were structured to avoid banking reporting requirements. They were structured to look like payments made pursuant to an employment contract. So there's lots of evidence that Mr. Booker was aware that what he was doing was unlawful and that he had the intent to commit fraud. And that's all that is necessary. And I think that's the only element that he contests. Turning to the question about the merger, the merger problem under Santos, the biggest there's two responses to that. But the most basic one is you can't have a merger problem in a concealment case because the idea in a concealment money laundering case is that you are using the financial transactions to conceal the illegality of what you've done. And in this case, the concealment money, first of all, each of those money laundering counts was specifically charged as concealment, not promotion concealment. And the concealment wasn't about the source of the funds, but the nature of those funds. So the argument that the government made was he concealed it by creating these false employment contracts. And then in the checks to Dolores Jordan, which supported each of the money laundering charges, they had a memo line that described the pay period for which she was getting these payments. And and so that was the concealment was the nature of the proceeds. So that fraud that supported the Medicaid funds had already been paid to Mr. Booker. The Medicaid fraud was finished and complete. And then he created this false trail with the with the checks that referred to a payment period. And that concealment money laundering is a different crime than the Medicaid fraud. And so there's no merger problem. And in this court's decision in Halstead, this court specifically says that if the the fraud counts are based on different payments than the money laundering counts, then there's no merger problem. And that was the case here as well. What about in cases after Halstead, I think it's Cloud and Simmons and Abdul, I can't pronounce it, but where they're saying that it's essential expenses to the scheme. Right. And this wasn't an essential. I mean, one could look at it and say, you know, on a broad scale, Judge Benjamin, that these were essential because maybe presumably Dolores Jordan wouldn't have participated if she hadn't ultimately received some money for it. But in terms of it's it's a whole different act. The concealing the money laundering concealment is a completely different act. And and it can't be that broad that it's any. So it's in in I don't remember. I mean, I litigated cloud and I don't remember the details of that case, I'm afraid. But in those cases, it was like it wrapped around. And in this case, that that Medicaid fraud was done and it was a different nature. And the 11th Circuit's case in Esquivias, I'm not sure how we pronounce that either, stands for the proposition that concealment money laundering simply cannot merge. It's a it's different conduct. Can I ask you about the sort of describe the activities of different people when you were talking about who did what? And I understood Mr. Allman's argument to be, well, my client was sort of the head of this organization trying to do good, and he didn't really know or understand what the others were doing. Sure. And that's why his intent wasn't proven to be on a reasonable doubt. So what's your response to that? Your Honor, that's a great argument to make to the jury and the jury rejected it. And that's my argument. In addition to the fact that we all of the evidence and I can go through joint appendix page numbers where he was aware that the kickbacks were illegal. He was he specifically told Mark Stringfellow that he could not reimbursement based on cups, that he knew he could not pay, you know, pay them based on urine cups per cup. Instead, he came up with this sort of invoice payment procedure. So there's lots of evidence. At the end of the day, the question is whether a jury could reasonably infer that he had that intent. There is no requirement in the law that the government show direct proof. A defendant does not have to get on the stand and say, I knew, nor do we have to have any particular piece of evidence in which he confesses that he knew. But boy, this case comes as close as any that I've ever handled in which it was very close. He almost said we have that evidence. We have something very close to that. We have Graves. We have Jordan. He and Jordan talked about the illegality. That's what she testifies to. We have Stringfellow and Payer all saying he knew it was illegal. That's plenty. Can I ask you about the audit evidence? Because I thought that the import of that evidence was primarily in rebuttal. But your colleague on the other side suggested that the exhibit came in even before the need for rebuttal. Is that right? No, Your Honor. Not exactly. So it wasn't during the government's rebuttal case. It was during the rebuttal. It was redirect testimony of Richard Graves. So what happened? And one thing that I did not include in my brief, Joint Appendix pages 768 and 69, the district court warns Mr. Booker, who of course was representing himself, hey, don't open the door to this evidence because if you do, it's going to come in. So at that point, it had not come in. It had not. That was before Mr. Graves testified. Mr. Graves testifies on direct. Then on cross-examination, that's when Mr. Booker starts questioning him over and over again. We were audited lots of times, weren't we? Yes. Were we ever told that the kickbacks were illegal? Well, no. Over and over again, he was asked that. And so it was on redirect examination when the government introduced that paragraph. And I would say a couple of things about that, of course. So it is true that it was a very easy response, I think, for us is he opened the door to it. It is also true that the confrontation clause is not implicated where it was admitted for a purpose other than the truth of the matter asserted. And in this case, it was it was admitted as evidence of intent, knowledge, lack of mistake. And I would also argue that even if it hadn't been admitted, the evidence was overwhelming. So any error in its admission would be harmless in any event. The only thing that that finding actually said was really about the provision of substandard housing and how he exploited the fact that he conditioned under Dolores Jones transitional housing programs, the housing subsidy was conditioned on the provision of urine cups. And so that paragraph said, yes, he conditioned the housing program on the provision of urine cups for drug testing. But we also had two other witnesses that testified to that directly. It was not it would have been harmless. There's no reasonable probability that the jury would have acquitted the defendant. Had that evidence not been admitted. I will turn if your honors don't have any other questions about that confrontation clause issue. I guess I'll turn to the sentence if your honors don't have any other questions about those issues. The district court did not clearly err in finding that at least nine and a half million dollars of loss was reasonably foreseeable to Mr. Booker. The district court heard evidence that over 11, about 11.8 million dollars of Medicaid funds went to Mr. Booker's company. And that was through the direct billing of urine for the urine drug tests. And I want to note that if your honors kind of take a deep dive into this, what we find is that when the when the when Medicaid was direct billed for this, those are the tests that we know came directly from from the from Mr. Booker's company and not from the substance abuse providers because the providers themselves, if somebody actually had a drug addiction problem and they were being seen by his organization for that problem, it was billed indirectly through the service provider. It was billed directly if it was a drug test that came from one of these sort of drug testing mills. So, over 11.8 million dollars that well exceeds the nine and a half million dollars that would support the 20 offense level increase that he received here. This sentence is a downward variant sentence. The district court considered his age, his medical condition. It considered his family. It also considered the difference between his sentence and the sentences that his co-conspirators received. This court has has made clear that a defendant who cooperates that the government is not similarly situated and the unwarranted sentencing disparity challenge doesn't really arise in that kind of situation. But in this in this case, where we have a presumption presumption of reasonableness that attaches to a within guidelines or below guideline sentence, Mr. Booker's has not rebutted that presumption of reasonableness. Your honors, if there are no further questions, the United States respectfully request that this court affirm the judgment of the district court. Thank you very much. Solomon, just briefly, your honor, if I may apologize for going over my time just very briefly with respect to the factual issues. The government indicated that Mr. Stringfellow would create an invoice after receiving a kickback. That may well be true, but he did not deal with Mr. Booker on that. That was Mr. Graves. Mr. Booker allegedly structured employment agreements. I don't think there's any evidence of that. I think even Miss Jordan's modified contract was negotiated by Mr. Graves and was referred to the attorney by Mr. Graves. In the Sandhills exhibit, we would argue that's testimonial in nature. And again, as I said earlier, it's a testimonial conclusion on the part of an administrative law judge that the jury gets to hear. So I do, again, take issue with that. I think that would be certainly something that Rule 403 should have excluded. And since our brief was filed, I kind of presumptively included the Loper Bright Industries for Shremondo case, which was decided, I think, four days later, simply to say that there is a problem with the catch-all, in our opinion, with respect to that statute. It basically gives the Department of Health and Human Services license to decide what is criminal, what is civil, what is right, what is wrong, what is fraud, and what is abuse. Again, this is new ground. I'm not exactly sure how this is going to shake out with respect to a lot of the APA practices. But obviously, this court is no longer required to give deference to what they choose to do, and I'm sure your honors are aware of that. You can take a look at this on your own and decide what impact, if any, that may have had with respect to this prosecution, which was instituted, of course, by the Sandhills audit in the beginning. So we would ask respectfully if there's no other questions for an order of dismissal, an order of a new trial, or at least an order of a new Senate hearing. Thank you, Mr. Allman. Mr. Allman, you noted at the beginning of your argument that your court appointed. I want to, on behalf of my colleagues and the entire court, thank you for taking on the appointment. We obviously could not do the work that we do without lawyers who would be willing to represent clients on a court-appointed basis, and we're grateful to you for your able argument here today. Ms. Ray, as always, always grateful to see you and appreciate your argument on behalf of the government. We'll come down and greet the two of you and then move on to our final case.
judges: Albert Diaz, G. Steven Agee, DeAndrea Gist Benjamin